IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:11-CR-00153-RJC-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, | )<br>)<br>) |
| *Plaintiff*, | )<br>)  **MEMORANDUM OF LAW IN**<br>)  **SUPPORT OF DEFENDANT**<br>)  **OANH THI LE'S MOTION IN** |
| vs. | )  **LIMINE AND IN RESPONSE TO**<br>)  **THE GOVERNMENT'S 404(b)** |
| HAI VAN NGUYEN and<br>OANH THI LE, | )  **NOTICE**<br>)<br>) |
| *Defendants*. | ) |

## INTRODUCTION

Defendants Hai Van Nguyen and Oanh Thi Le, married legal immigrants from Vietnam, who came to this country in 1980, are charged with making cash deposits and withdrawals in amounts less than $10,000.00 with several banks from February 2006 until November 2006. The government, however, seeks to introduce against both defendants evidence relating not just to these charged transactions, but also evidence relating to various acts one or the other (or their daughter) engaged in years earlier. This Memorandum is submitted in response to the Government's 404(b) Notice and in support of the attached motion in limine regarding this evidence, and addresses the relevancy of the evidence as well as the unfairly prejudicial impact such evidence would have in the trial of this matter.

## EVIDENCE AT ISSUE

In the Government's 404(b) Notice three particular matters are identified as evidence the government seeks to introduce against Oanh Thi Le:[1]

1. evidence relating to cash transactions under $10,000 in 1998 and again in 2003, all of which were conducted solely by Hai Van Nguyen;

2. evidence relating to an insurance claim made by, and subsequently paid to, the Defendants in 2002-2003; and

3. evidence relating to the Defendants' *and their daughter's* reported income between 1999 and 2006.

With regard to the Government's intent to introduce evidence relating to the cash transactions conducted by Hai Van Nguyen in 1998 and 2003, Oanh Thi Le had no role in any of those transactions, as confirmed by the Cash Transaction Reports ("CTR's") provided to the defendant by the government. If the government is permitted to offer evidence of the transactions engaged in by Defendant Nguyen years before the charged transactions, Defendant Le should be severed from this trial, due to the danger of unfair prejudice stemming from their marital relationship.

With regard to evidence relating to an insurance claim filed in 2002 and paid (by check) in early 2003, the government apparently seeks to argue that this claim was fraudulent. Besides having nothing to do with the cash transactions in 2006 and 2007, such evidence will necessitate a "trial within a trial," as neither the insurance companies' investigation nor the government's investigation developed any tangible evidence of fraud. In short, if the government is permitted to introduce this evidence, Defendant Le

---

[1] Defendant Hai Van Nguyen has joined in this motion, but the facts with regard to the admissibility of some of the evidence proffered by the government differ as to him.

will be forced to introduce extrinsic evidence establishing the purchase and appraisal of the jewelry and the validity of the insurance claim. This entire subject, besides being irrelevant to the cash transactions that took place 4-5 years later, is designed solely to unfairly prejudice Defendant Le in the eyes of the jury by creating the implication that she committed insurance fraud.

Finally, with regard to the tax returns, the government seeks to introduce only a selective and highly misleading portion of the returns filed by Defendants jointly – those filed from 1999 to 2006, showing total income in those years of about $87,000. But Defendants' income during this period was drastically reduced from prior years. Social Security records in the possession of the government show that the Defendants' reported income from 1981 through 2005 was $663,634. In addition, the government concedes that the "cash hoard" (normally referred to as "savings") that the Defendants had *in 1998* formed the basis of the "cash hoard" they deposited in 2006. Thus, the relevant question is not what the Defendants reported as income in 1999-2006. The relevant question is what they reported as income from 1981-1998. Based on the government's own figures, that total is at least $575,000.[2]

Nor is that the only unfairly prejudicial tax information the government seeks to introduce. Although there is no allegation that Defendants' adult daughter engaged in any of the charged transactions, the government seeks to introduce *her tax returns* against defendant Le and her husband– because, the government alleges, these returns show that

---

[2] Total reported income of approximately $663,000.00 from 1981-2005, less reported income of approximately $87,000.00 from 1999-2006, equals reported income of $576,000.00 from 1981 – 1998.

3

*their daughter* improperly claimed dependents. However, this has nothing to do with the cash transactions alleged in the indictment, and is offered only to "dirty up" the Defendants' family in the eyes of the jury.[3] It is both irrelevant and unfairly prejudicial.

## FACTS

Defendants Hai Van Nguyen and Oanh Thi Le are a married couple who, along with their one-month-old daughter, legally immigrated to the United States from Vietnam in 1980. Upon their arrival in North Carolina, both parents found jobs in the textile mills, working hundreds of hours of overtime each month, lived frugally, and began to save money. Week after week, the Nguyen's put away their earnings, as documented in meticulously kept check registers provided to the Government. As the Nguyen family grew to include three sons and another daughter, frugality continued as a way of life: from renting a room in their apartment or house to other immigrants, to shopping at thrift stores, to growing food in a homegrown garden, the Nguyen family found a way to make a comfortable, if spare, life for themselves. But mostly, they saved money for the future. They were able to buy a small house and a car from their cash savings, lent money to other Vietnamese immigrants who had opened businesses and, in the custom of the Vietnamese, purchased jewelry whenever they could as an investment, and to eventually give to their children.

When their hours at the mill dwindled, Hai Van Nguyen and Oanh Thi Le became small business owners and in 2000 opened a walk-in nail salon called Nails Inn next to a

---

[3] In its Notice of Summary Witnesses and Exhibits, the Government indicates that it also intends to offer into evidence summary charts regarding their income tax returns. Defendant Oanh Thi Le objects to these summary charts on the same ground.

Wal-Mart in Shelby, North Carolina. The salon was busy at first, until the adjoining Wal-Mart closed. But Hai and Oanh Thi still work there every day. Although the salon did not generate the amount of income the Nguyen's earned through their work in the mills, it covered the family's modest expenses.

On March 13, 2007, the Government seized $207,870.43 from the Nguyen's – essentially the Nguyen's life savings – all from the certificates of deposit in the names of the Defendants and their children at First Charter Bank and Shelby Savings Bank. The seizure warrant for these funds alleged that they constituted property involved in, or traceable to, deposits structured to avoid currency reporting requirements in violation of 31 U.S.C. §5324(a). There was no allegation that the funds were the proceeds of any illegal activity. A four-year investigation followed, after which the current indictment was returned – charging only that defendants engaged in a conspiracy to structure cash transactions to cause the banks not to file CTR's with the federal government.

## THE GOVERNMENT'S THEORY

This is a pure structuring case, and no underlying or accompanying illegality is charged in the indictment. After an exhaustive investigation by the Federal Government that spanned four years and included a detailed review of virtually every aspect of the Defendants' financial life[4], the Government has not discovered, nor has the government alleged, that a single dollar of Defendants' "cash hoard" can be shown to be the proceeds of illegal activity.

---

[4] *See* Defendant's Memorandum of Law in Support of Motion to Strike Prejudicial Surplusage from the Indictment.

5

Case 3:11-cr-00153-RJC-DCK   Document 63   Filed 03/26/12   Page 5 of 15

This is not a tax evasion case. This is not a money laundering case. This is not an insurance fraud case. And the Government should not be allowed to introduce evidence suggesting otherwise simply because it seeks to elicit an emotional response from the jury. Our system of justice is based on the principle that juries are to render a verdict based on competent, admissible evidence – not irrelevant and prejudicial speculation.

## Prior Cash Transactions

The government seeks to introduce evidence that in 1998, "*Defendant Nguyen* received over $121,000.00 in cash from *his* structured withdrawals at BB&T." United States' 404(b) Notice, page 6. In addition, the government seeks to introduce evidence that "[i]n 2003, *Defendant Nguyen* was again involved in a series of structured cash withdrawals – this time from Carolina National Bank." More specifically, the government seeks to introduce evidence that "[b]etween January 17 and February 5, 2003, *Defendant Nguyen* made thirteen (13) cash withdrawals from his daughter's savings account in amount [sic] less than $10,000. There is no evidence that Oanh Thi Le had anything to do with these withdrawals. Indeed, the two CTR's filed by Carolina National Bank on January 27 and February 3, 2003 list Hai Van Nguyen as the only participant in these transactions.

The government offers two theories for the admissibility of this evidence. First, the government argues that this evidence is "inextricably linked to the charged offenses" because "Defendant Nguyen's structured cash withdrawals in 1998 and 2003 are part of the cash hoard from which the defendants made their structured cash deposits in 2006." In short, the government claims that it is relevant that the cash that was deposited in

6

amounts less than $10,000.00 in 2006 and 2007 was withdrawn from defendant's bank accounts in 1998 and 2003. But the fact that this cash came from their own bank accounts is not "inextricably linked" in any legally relevant way to the charged transactions in 2006 and 2007. No matter where this cash came from, the question is whether the charged transactions were engaged in for the purpose of preventing the bank from reporting these cash deposits to the federal government.[5]

>Recognizing this, the government's second argument is that

>"[t]he mere fact that *Defendant Nguyen* on two prior occasions conducted multiple (over 27) cash transactions in amounts less than $10,000 at two different financial institutions is probative of *his* intent to structure. Evidence that representatives of Carolina National Bank questioned *him* about these activities in 2003 . . . is further evidence that *he* was aware of the Bank Secrecy Act's (BSA's) requirement that financial institutions in the United States must complete CTR's for all cash transactions over $10,000.

>    \*          \*          \*          \*

>There is no question that the transactions occurred and the *Defendant Nguyen was the responsible party*. As for the probative value of the evidence, it is hard to imagine any evidence more indicative of a defendant's intent to structure cash deposits than *his* prior structuring of the cash withdrawals . . . ."

United States' 404(b) Notice, pages 8-9. Regardless of the validity of this argument as it applies to Hai Van Nguyen, it has no validity with regard to Oanh Thi Le.[6] She had nothing to do with these prior cash transactions, so they cannot serve as evidence of her knowledge or intent. This is clear from the fact that if Oanh Le was being tried alone,

---

[5] If anything, the fact that this cash came from their own bank accounts indicates that there was no motive or intent to prevent the bank from reporting these cash deposits to the federal government.

[6] Contrary to the cases cited by the government in their 404(b) notice, there is no evidence that anyone ever told Hai Nguyen about the fact that the forms the bank filled out went to the federal government.

7

this evidence would not be admissible against her under Rule 404(b), Rule 401, or Rule 403 of the Federal Rules of Evidence.

Nor can the unfairly prejudicial effect of this evidence against Oanh Li be adequately addressed by a limiting instruction, given the long marriage relationship between her and Hai Van Nguyen. No matter what they are instructed, the jury will inevitably assume that in the charged conspiracy, she shared her husband's knowledge and intent. If this evidence is to be admitted against Hai Van Nguyen, the trial of Oanh Thi Le should be severed, and she should be tried separately. Alternatively, the Court should hold that this evidence is not admissible in a joint trial under Rule 403 of the Federal Rules of Evidence.

### Insurance Claim

The government argues that evidence of a $130,000.00 insurance claim filed by Oanh Le is "relevant to prove Defendants' motive for disguising the insurance settlement proceeds through structuring." More specifically, the government makes the following convoluted argument:

1. State Auto and Allstate paid defendants' claims in the total amount of about $130,000 in 2003 – by checks drawn on the accounts of the insurance companies to Hai Van Nguyen and Oanh Thi Le.[7]

2. Hai Nguyen deposited these checks into an account he opened at Carolina National Bank. There was no attempt to cash these checks and keep the cash proceeds on hand, or to otherwise "disguise" the insurance proceeds.

---

[7] The claim was investigated fully by both insurance companies, at which point a decision was made to pay it. The government's four-year investigation revealed no evidence that the claim was fraudulent, no matter how suspicious the government may think it is.

8

3. Despite the fact that the insurance checks had already been deposited into a bank account opened by Hai Nguyen, the government claims defendants were "motivated to reduce the proceeds of their claims to untraceable cash," rather than just leaving the proceeds in the bank, although no rational motivation for doing this is described.

4. The defendants then allegedly found it "difficult" to spend or invest their insurance benefits without attracting "undue attention." In support of this speculation, the government claims that in May 2005 Oanh Le purchased for $15,600 in cash a Toyota Corolla, which caused the dealer to file a CTR. In fact, it was her son Tony who purchased the car, and it was Tony who received notice three months later that the car dealer had filed a Form 8300 (not a CTR).

5. The filing of such a form by the car dealer in May 2005, according to the government "could raise questions about the insurance claims themselves and/or how the defendants acquired the wealth needed to purchase an $89,000 pendant and other luxury items," despite the fact that these questions had previously been raised and answered by the insurance companies when they wrote the defendants checks in early 2003, more than two years earlier. Why the filing of a form with the federal government in 2005 could raise such questions is left unexplained.

6. "Therefore, in 2006, about three years after the claims had been made [and paid], the defendants deposited the cash they received from their [actually Hai Nguyen's] structured withdrawals of insurance proceeds into different accounts in their other children's names thinking that the danger of any recoupment by the insurance companies [which was never threatened or mentioned in 2003] had passed and the funds could not be easily traced." No evidence regarding this alleged "thinking" by the defendants is described.

The government's theory of admissibility makes no common sense. Once the insurance claims had been paid, and the insurance checks deposited into a bank account, there was no reason to withdraw the funds to "hide" the alleged fraud, nor would withdrawing the money in cash help to hide or perpetuate any fraud. The insurance companies knew all of the facts (and the allegedly "suspicious" circumstances), and had

9

already paid the claims.[8] Nor is there any evidence that the defendants had any "difficulty" (or reluctance) in spending cash.

The government asserts, without any reasoning or logic, that the filing of the Form 8300 by a car dealer in May 2005 in the name of Tony Nguyen (and mailed to Tony Nguyen) could "raise questions" about Oanh Thi Le's 2002 insurance claims or "how the defendants acquired the wealth needed to purchase an $89,000.00 pendant and other luxury items." To say this is a leap of logic would be an understatement. The fact that Tony Nguyen bought a $15,000.00 car in cash in May 2005 hardly calls into question the insurance claims filed by Oanh Thi Le or Hai Nguyen in 2002, let alone any issue about how the defendants acquired jewelry in the years leading up to 2003. If the insurance companies were somehow to be made aware of the Form 8300, and the fact that Tony Nguyen was related to Oanh Thi Le and Hai Van Nguyen, and there is no explanation as to how either of these events would happen, they might at most assume that the car was purchased with funds from their settlement.

Finally, there is no evidence that in 2006 the defendants "thought that the danger of any recoupment by the insurance company had passed and that the funds could not easily be traced," as the government blithely alleges, that "they could not pay all of their

---

[8] Tellingly, the Government also fails to include in its Memorandum the fact that Defendants have provided to the Government check registers going back to January 1987 and running through May 1998 that reflect regular deposits from hourly wages earned at the mills which total nearly $400,000.00, an amount more than sufficient to buy $130,000.00 worth of jewelry. And in an effort to cast further suspicion on the insurance claim, the Government points to the benign fact that the Nguyen's purchased a second insurance policy. There is absolutely nothing improper about purchasing a second homeowner's insurance policy in order to insure an item of value that has been rejected by another insurance carrier. Indeed, it is for precisely this reason that every insurance policy contains a provision that protects the insurer from duplicative payment should an insured be covered by more than one policy.

10

children's college expenses in cash without triggering CTR reports," or that they "need[ed] to place their cash back into bank accounts where they could freely spend or invest it without generating any reports to their government." United States' 404(b) Notice, pages 12-13. These are simply speculative theories concocted to hide the real point of the evidence – to unfairly prejudice defendants by implying, without any proof, that they engaged in insurance fraud.[9] Evidence that a 2002 insurance claim was paid by check in 2003 does not show any motive to structure transactions in 2006 "to disguise the source of [defendants'] cash hoard." *Id*. at 13.[10]

### Reported Income

The government concedes that the defendants' Social Security records establish that between 1981 and 2005, Defendants reported income of about $663,000.00 to the federal government. United States' 404(b) Notice, page 14. The government also concedes that the savings accumulated by the defendants prior to 1998 was part of the "cash hoard" that was deposited in 2006. *Id*. at 8.[11] Despite these concessions, the government seeks to introduce into evidence only the tax returns filed by defendants from 1999-2006.

---

[9] This bald speculation is precisely why the evidence of the insurance claim is inadmissible under any theory.

[10] The Government's characterization of these events is misleading at best. As a threshold matter, when a federal agent questioned Oanh Thi Le about the source of the family's savings, among the sources she voluntarily identified was the proceeds from the insurance claim. There was no attempt to hide this. Moreover, it is undisputed that the insurance checks were deposited, in full, into legitimately held savings accounts in the regular course of banking business. There was no attempt to alter the checks, or sign over the checks to another person, or seek out a less "official" check-cashing outlet or any other behavior that would indicate intent to "disguise" the insurance settlement proceeds. How, or whether, the funds were later withdrawn is irrelevant – and the fact that the funds were withdrawn at all is simply inconsistent with a theory of "hiding" the proceeds.

[11] "Defendant Nguyen's structured cash withdrawals in 1998 and 2003 are part of the cash hoard from which the defendants made their structured cash deposits in 2006." United States' 404(b) Notice, page 8.

11

The reason why the government seeks to be so selective in what it puts before the jury is obvious. From 1999 through 2006, the defendants reported income was a total of only $87,000.00 (in contrast to the hundreds of thousands of dollars of income they reported in the years leading up to 1999). *Id*. at page 14. The government also points out that the gross income reported by defendants' business decreased by more than 50% after 2002, and directly implies that this was because Oanh Le took over the preparation of the returns from H&R Block, rather than because of a legitimate business explanation (*i.e.* the closing of the adjoining Wal-Mart). *Id*. at 14-15. Finally, the government goes to great lengths to explain that due to various deductions, the defendants paid only $1,347.00 in taxes between 2000 and 2006, and that they received "refunds" based upon the earned income credit. None of this has anything to do with the alleged structuring. The purpose, quite clearly, is simply to prejudice the jury against the defendants.

There is no legitimate justification for the government selectively introducing only a few years of the defendants' tax returns, especially because Oanh Le told the agents that the source of the funds deposited in the bank in 2006 and 2007 was defendants' savings from their work at the mills (which ended in 2000). *Id*. at 13-14. However, if the government wants to introduce *all* of the defendants' tax returns and Social Security statements reflecting the income they earned from 1981-2005, defendant Oanh Thi Le has no objection.[12]

---

[12] Although the government conducted a four-year investigation of defendants, defendants have recently learned the government did not obtain any of their tax returns prior to 1999. Defendants recently provided the government with their tax returns from 1986 through 1996, but could not find their returns for 1981-1986, 1997 or 1998. Defendants have requested that the government seek a court order that the IRS produce those returns. Defendants also request that the Court issue such an order.

Defendant Le *does* object to the introduction of *her daughter's* tax returns between 1999 and 2006. The ostensible justification for the government's desire to introduce these returns is Defendant Le's statement to agents that part of the money deposited in 2006 and 2007 came from her daughter. The returns certainly do not impeach that statement – her daughter reported total W-2 income of almost $150,000.00 between 1999 and 2006. Defendants agree that evidence of this income, as reflected on W-2 statements, is relevant - to corroborate Defendant Le's statement to the agents.

But that is not why the government seeks to introduce these returns. Instead, the real purpose of this evidence, as explained by the government, is to show that defendant's daughter listed five people *as dependents*, including two of her brothers, an uncle, and two "others," that she and defendants allegedly "alternated claims for the same dependents in different tax years depending on who would benefit the most" (not that they claimed duplicate dependents in the same year), and that her daughter also received tax refunds in 2003 and 2004. *Id*. at 15.

While this certainly raises questions about the legitimacy of the deductions being claimed *by defendants' daughter*, it has nothing to do with impeaching Defendant Le's statement that part of the funds deposited in 2006 came from her daughter, or with the defendants' alleged motive to structure – to disguise their wealth by depositing it into their children's accounts in amounts that would not trigger a report to the government. The defendants' daughter's deductions have no relevance to any fact at issue, are offered only to cast aspersions on defendants' daughter (and by extension on defendants

13

themselves), and are unfairly prejudicial to defendant Le. This evidence is therefore inadmissible under Rules 401, 403 and 404(b) of the Federal Rules of Evidence.

## LIMITING INSTRUCTIONS

The government essentially concedes that the evidence set forth in its 404(b) Notice is unfairly prejudicial by urging the Court to provide the jury with "appropriate limiting instructions." Defendant Le respectfully requests that the Court reject the government's invitation to ignore the rules of evidence, and to "cure" any resulting harm through limiting instructions. The evidence sought to be introduced by the government is irrelevant, unfairly prejudicial, and inadmissible as a matter of law. No limiting instruction suffices to replace the Federal Rules of Evidence, which are carefully designed to insure that defendants are tried fairly, and based upon evidence properly admitted.

RESPECTFULLY submitted this the 26 day of March, 2012.

**RUDOLF WIDENHOUSE & FIALKO**

_/s/_ David S. Rudolf
Sonya Pfeiffer: NCSB #37300
David S. Rudolf; NCSB #8587
225 East Worthington Avenue
Charlotte, NC 28203
Telephone: 704-333-9945
Email: spfeiffer@rwf-law.com
Email: dsrudolf@rwf-law.com

Attorneys for Oanh Thi Le

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 26, 2012, I electronically filed the foregoing **Defendant Oahn Thi Le's Memorandum of Law in support of Motion in Limine** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following parties.


Michael E. Savage
Assistant United States Attorney
Suite 1650
Carillon Building
227 West Trade Street
Charlotte, NC  28202

H.M. Whitesides, Jr.
Law Offices of H.M. Whitesides, Jr., P.A.
225 East Worthington Avenue
Suite 100
Charlotte, NC  28203


RESPECTFULLY submitted this the 26 day of March, 2012.


RUDOLF WIDENHOUSE & FIALKO


  /s/ David S. Rudolf
Sonya Pfeiffer: NCSB #37300
David S. Rudolf; NCSB #8587
225 East Worthington Avenue
Suite 200
Charlotte, NC  28203
Telephone:   704-333-9945
Telefax:        704-335-0224
Email:           speiffer@rwf-law.com
Email:           dsrudolf@rwf-law.com

15